Steven McKinley (State Bar No. 89656)
McKINLEY LLP
402 W. Broadway, Suite 1815
San Diego, CA 92101
Telephone: (619) 297-3170
Facsimile: (619) 255-2833
E-mail: steven@mckinleylegal.net

Attorneys for Plaintiff Village Communities, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VILLAGE COMMUNITIES, LLC, ) <br><br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> COUNTY OF SAN DIEGO; BOARD ) <br> OF SUPERVISORS OF COUNTY OF ) <br> SAN DIEGO; and DOES 1-20, ) <br> ) <br> Defendants. ) <br> ) <br>————————————————— ) | Case No. **'20 CV 1896 JM    DEB** <br><br> **COMPLAINT FOR INVERSE CONDEMNATION AND EQUAL PROTECTION AND SUBSTANTIAL DUE PROCESS VIOLATIONS; AND VERIFIED PETITION FOR WRIT OF MANDATE** |

## INTRODUCTION

### A.    Overview

1.    This action presents as-applied constitutional challenges to the June 24, 2020 final decision by the Board of Supervisors (Board) of San Diego County (County) to deny the development application of landowner and project applicant Village Communities, LLC (Village Communities) for a new home and mixed-use community known as Lilac Hills Ranch (Project or Lilac Hills Ranch). The Project site is located on approximately 608 acres in unincorporated North San Diego County, California.

2.    The Project site is situated approximately one-half mile east of Interstate 15 (I-15) and Old Highway 395, an area known as the "Interstate 15 Corridor." In 2010 and earlier, the County recognized several important facts concerning the Interstate 15 Corridor, namely: (a) it was a critical transportation link passing through several unincorporated North County communities, including Bonsall and Valley Center, which already encompassed a substantial urban population; (b) it contained existing development with capacity for growth, which was appropriate along a major transportation corridor; (c) substantial growth was planned within one mile of the Interstate 15 Corridor; and (d) additional growth above the County's General Plan Update was contemplated in General Plan Amendment projects undergoing their own planning and environmental review process through the County. Lilac Hills Ranch was one of those important General Plan Amendment projects well within the Interstate 15 Corridor — an area intended to assist the County in addressing San Diego's housing availability and affordability crisis.[1] Due to the County's Project denial, the Lilac Hills Ranch community can no longer be part of the solution to the

---

[1]    Statewide median home price eclipsed the $700,000 mark in August 2020 ($706,900). Tight housing inventory was among the factors contributing to the new statewide home price record. San Diego County's median home price climbed to $732,560 in August 2020, due in part to persistently low housing inventory. (*The Daily Transcript*, Vol. 135, No. 182, September 18, 2020.)

COMPLAINT FOR INVERSE CONDEMNATION AND EQUAL PROTECTION AND SUBSTANTIAL DUE PROCESS VIOLATIONS; AND VERIFIED PETITION FOR WRIT OF MANDATE

County's housing crisis.

3.   In sum, Village Communities and its consulting team of eight fire experts have never asked the County to support or vote for a project that does not meet fire safety standards or that is not a fire-safe community. The issue was not if, but how, to implement staff's fire safety requirement. Specifically, the issue was how to ensure vegetation management can be implemented and maintained on the off-site segment of West Lilac Road, as identified by staff.

**B.   Project Denial Violated the "Unconstitutional Conditions" Doctrine**

4.   The "'unconstitutional conditions' doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (*Koontz*). In the land-use permitting process, "applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit … [and] can pressure an owner into voluntarily giving up property [or money] for which the Fifth Amendment would otherwise require just compensation." *Id.* at 605, 612. Provided the land-use permitting "is more valuable than any just compensation, the owner could hope to receive [for the exaction or condition], the owner is likely to accede to the government's demand, no matter how unreasonable." *Id.* at 605. The Court in *Koontz* added that "[e]xtortionate demands of this sort frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine *prohibits* them." *Id.*, emphasis added.

5.   The Court in *Koontz* also focused on the other "reality" of the land-use permitting process. Citing the *Nollan* and *Dolan* cases,[2] the Court noted that the cases accommodate permitting process realities by "allowing the government to condition approval of a permit … so long as there is a 'nexus' and 'rough

[2] *Nollan v. California Coastal Comm'n.*, 483 U.S. 825 (1987) (*Nollan*) and *Dolan v. City of Tigard*, 512 U.S. 374 (1994) (*Dolan*).

COMPLAINT FOR INVERSE CONDEMNATION AND EQUAL PROTECTION AND SUBSTANTIAL DUE PROCESS VIOLATIONS; AND VERIFIED PETITION FOR WRIT OF MANDATE

proportionality' between the property that the government demands and the social costs of the applicant's proposal," thus enabling "permitting authorities to insist that applicants bear the full costs of their proposals *while still prohibiting* the government from engaging in 'out-and-out … extortion' that would thwart the Fifth Amendment right to just compensation." *Id.* at 606, emphasis added. The Court in *Koontz* added that under *Nollan* and *Dolan*, "the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it *may not leverage its legitimate interests in mitigation to pursue governmental ends that lack an essential nexus and rough proportionately to those impacts.*" *Id.*, emphasis added.

6.     Further, the Court in *Koontz* clarified that the "principles that undergird our decisions in *Nollan* and *Dolan* do not change depending on whether the government *approves* a permit on the condition that the applicant turn over property or *denies* a permit because the applicant refuses to do so." *Id.* at 606, emphasis in original. The Court recognized that "regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Id.*

7.     Moreover, the Court in *Koontz* answered the question of "how the government's demand for property can violate the Takings Clause even though 'no property of any kind was ever taken,'" stating that "the unconstitutional conditions doctrine provides a ready answer," namely that:

> *Extortionate demands* for property in the land-use permitting context run afoul of the Takings Clause not because they take property but *because they impermissibly burden* the right not to have property taken without just compensation.  As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury.

*Id.* at 607, emphasis added.

4

8.    The Court in *Koontz* also rejected the argument there could be no takings claim if the condition or exaction was to "spend money rather than give up" an interest in land, holding that "'monetary exactions' must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan*." *Id.* at 612.

**C.    Project Denial Violates the Fifth Amendment and Is Prohibited by the "Unconstitutional Conditions" Doctrine**

9.    In this case, the County denied Lilac Hills Ranch solely because Village Communities was unable to obtain off-site roadside easements (Fuel Modification Easements) over 50 privately owned properties, at a substantial cost, to establish and maintain a 20-foot "fuel modification zone" for fire clearing purposes along an off-site segment of an existing public right of way known as West Lilac Road, a County Circulation Element Roadway.    Without the Fuel Modification Easements, the County asserted it had "no guarantee" the roadside vegetation management will occur.    Thus, despite prior support from County staff and the Planning Commission (in 2010, 2015, 2018 and 2020), the County predicated its Project denial on the claim that without the Fuel Modification Easements, the Project was "unsafe," and therefore, inconsistent with its General Plan safety policies.    As shown below, there is no General Plan inconsistency.

10.    Further, the County's Fuel Modification Easement condition was imposed without any essential nexus or proportionality to a legitimate governmental purpose because the County already had the legal authority and responsibility to maintain fire clearing along driveways and roads under the County Consolidated Fire Code (section 4907.2.1).    Said ordinance had the force of law and authorized the County to perform the same fuel modification maintenance that would be authorized under the Fuel Modification Easements, making the latter unnecessary.    Moreover, Village Communities had already agreed to provide $2 million, plus a Homeowner's Assessment, to ensure funding for the roadside management in perpetuity, and made other proposals to solve the "easement" impasse with the County.    However, the

5

County summarily dismissed the funding, and never gave any consideration to Village Communities' proposals for resolution. Instead, though not needed or required, the County insisted that Village Communities acquire the Fuel Modification Easements over 50 privately owned off-site properties and denied the Project on the pretext it was "unsafe" without them.

11. The County's Fuel Modification Easement condition is unprecedented. Based on testimony from the County, there are no other similarly situated General Plan Amendment projects in the County with the same or similar easement condition — a condition imposed only on Lilac Hills Ranch and not on any other similarly situated General Plan Amendment project pending within the County at or about the time the County denied the Project. As shown below, the other projects had the same or similar characteristics, road conditions, and vegetation management issues. However, the County did not require any of those other projects to obtain off-site roadside easements.

12. Additionally, the County's Fuel Modification Easement condition was imposed, *ad hoc*, with no supporting Board policy, General Plan policy, law, or regulation. To the contrary, County's fire safety policy since 2011 has been that housing can be developed within County urban wildland fire interface areas provided fire safety features are imposed and evacuation planning is analyzed and implemented. The Lilac Hills Ranch community: (a) meets or exceeds all Fire Code requirements; (b) provides multiple (5) evacuation routes; (c) implements the County's requirements to enhance fire protection, prevention, and evacuation measures; and (d) ensures substantial funding ($2 million) for the off-site roadside vegetation management in perpetuity. Accordingly, the County's unprecedented demand that Village Communities show ownership of Fuel Modification Easements over 50 privately owned off-site properties before rendering a decision on the Project was arbitrary, clearly erroneous, and unconstitutional.

13. The County also has failed to vet its new easement requirement through

6

any previously adopted Board policy, guideline, or rule making process. Instead, the County imposed the new, unprecedented easement condition and denied the Project because Village Communities refused to accede to the County's demand to acquire the Fuel Modification Easements.

14.    The County's Fuel Modification Easement condition was imposed not as a post-project condition of approval, but instead as a pre-project approval condition — without any assurance that the Project would be approved if the 50 Fuel Modification Easements, in fact, were purchased and provided to the County. Said differently, if Village Communities had spent millions of dollars to acquire the 50 Fuel Modification Easements, the County could still have denied the Project — leaving Village Communities holding 50 worthless easements, for which Village Communities would have paid a substantial amount of money, the amount of which will be proven at the time of trial.

15.    Imposing the new easement condition also vested any one of the 50 affected private property owners with the *de facto* power to deny the Project by simply refusing to grant the needed easement. This veto power granted to each of the 50 property owners made it effectively impossible for Village Communities to comply with the unreasonable easement condition.

16.    As more fully set forth below, the County prejudicially abused its discretion and denied the Project solely because Village Communities did not own the 50 Fuel Modification Easements over off-site properties owned by others. The County's denial was arbitrary, capricious, and without any legitimate governmental purpose or supporting evidence. Such demands for property, or for money to acquire such property, run afoul of the Fifth Amendment right to just compensation for property or money the government takes when owners apply for land-use permits under the *Nollan, Dolan,* and *Koontz* decisions of the U.S. Supreme Court. Such demands also impermissibly burden the right not to have property or money taken without just compensation. As in other unconstitutional conditions cases in which a

7

project applicant refuses to cede a constitutional right in the face of an agency's coercive pressure, the denial of a government approval on prohibited grounds is a constitutionally cognizable injury. The result of the County's denial was to also violate Village Communities' right to equal protection under the laws, particularly when no other similarly situated County General Plan Amendment project was required to obtain such easements.

17. Accordingly, Village Communities seeks: (a) just compensation for a permanent and temporary taking; (b) damages for violating Village Communities' equal protection and substantive due process rights ensured under the U.S. Constitution; (c) declaratory relief; and (d) other relief under state law as needed or required.

**PARTIES**

18. Plaintiff Village Communities, LLC is a limited liability company organized and operating under the laws of the State of Delaware. The address of Village Communities' registered office in Delaware is 251 Little Falls Drive, City of Wilmington, County of New Castle; however, it also has been doing business in San Diego County from October 2017 to the present. At all times relevant, Village Communities was the record owner of the subject property known as Lilac Hills Ranch. As of 2017 and to June 24, 2020, Village Communities was the Project applicant, with offices located at 11452 El Camino Real, Suite 120, San Diego County, California.

19. Defendant County of San Diego is, and was at all times herein alleged, a local county within the State of California responsible for land-use permitting and environmental review within the County. The County is also the "lead agency" under the California Environmental Quality Act (CEQA) with principal responsibility for conducting environmental review and approving or denying a project within the County. While acting or purporting to act in the performance of its official duties, the County violated Village Communities' constitutional rights and that unlawful action

8

was a substantial factor in causing Village Communities harm and damages under 42 U.S.C. § 1983.

20. Defendant Board of Supervisors of the County of San Diego, is, and was at all times herein alleged, the duly elected decision-making body of Defendant County. As the decision-making body, the Board is charged with responsibilities under CEQA and other laws for conducting a proper review of a proposed project and granting or denying various approvals needed for a project. The Board and its members are sued here in their official capacities. This action centers on the County Board's final decision to deny the Project on June 24, 2020. While acting or purporting to act in the performance of its official duties, the Board violated Village Communities' constitutional rights and that unlawful action was a substantial factor in causing Village Communities harm and damages under 42 U.S.C. § 1983.

21. Village Communities is unaware of the true names and capacities of Defendants DOES 1-20 and sues such defendants by fictitious names. Village Communities is informed and believes, and on that ground alleges, that the fictitiously named defendants are also responsible for the actions described in this complaint. When or if the true identities and capacities of these defendants have been determined, Village Communities will amend this complaint, with leave of Court if necessary, to insert such identities and capacities.

**JURISDICTION AND VENUE**

22. This action is brought under 42 U.S.C. § 1983 relative to Defendants' deprivation of, and undue burden on, Village Communities' constitutional rights to equal protection, due process, and just compensation for permanent and temporary takings under the Fifth and Fourteenth Amendments to the U.S. Constitution.

23. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court also has authority to grant declaratory relief under 28 U.S.C. § 2201, as well as damages under 28 U.S.C. § 1343(a) and attorneys' fees and costs under 42 U.S.C. § 1988.

24. Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claim asserted under California law because: (a) this is a civil action of which this Court has original jurisdiction; (b) the state claim is so related as to constitute the same "case or controversy;" (c) the state claim does not raise a novel or complex issue of state law (but is not required in light of the recent U.S. Supreme Court decision in *Knick v. Township of Scott,* 139 S. Ct. 2162, 2170 (2019)); (d) the state claim does not substantially predominate over the more prevalent federal constitutional claims over which this Court has original jurisdiction; and (e) there are no other compelling reasons for declining jurisdiction of this incidental state claim.

25. The Southern District of California is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is a district in which Defendants maintain offices, exercise their authority in their official capacities, reside, and have taken action depriving Village Communities of its constitutional rights.

## STATEMENT OF FACTS

### A. Project Location

26. Lilac Hills Ranch, a planned housing and mixed-use community on a 608-acre site within the Valley Center and Bonsall Community Plan areas of unincorporated North San Diego County, is situated approximately one-half mile east of I-15 and Old Highway 395. Numerous existing residential communities are located within a five-mile radius of the Project site, including a 3,000-unit General Plan Amendment (Campus Park / Meadowood), two miles to the north, that the Board approved unanimously in 2011.

27. Specifically, the Project site is located south of West Lilac Road, west of Rodriguez Road, east of Old Highway 95, and north of Nelson Way on 59 parcels in the westernmost portion of Valley Center (approximately 530 acres) and the easternmost portion of Bonsall (approximately 78 acres). The Valley Center and

COMPLAINT FOR INVERSE CONDEMNATION AND EQUAL PROTECTION AND SUBSTANTIAL DUE PROCESS VIOLATIONS; AND VERIFIED PETITION FOR WRIT OF MANDATE

Bonsall communities are situated approximately 10 miles north of the City of Escondido.

28. The Project site is generally characterized by agricultural lands and rolling hills, and the primary existing land uses on-site are agricultural, including different types of crops, citrus, and avocados. Wells are located on-site and are used to provide water to irrigate the orchards and other agricultural areas.

**B.    Project Approvals**

29. The Project application involved requests for a General Plan Amendment, Specific Plan, Rezone, Tentative Maps, Major Use Permit, and Site Plan to implement the Project. Other Project requests included certification of an Environmental Impact Report (EIR) under CEQA, adoption of associated environmental findings, and approval of Project conditions. The original Project applicant was Accretive Investments, Inc. In 2017, Village Communities acquired the site and became the owner and Project applicant.

30. The Project's planning and processing spanned an approximate 10-year period that was extraordinarily drawn out, and very expensive. Since initiating Project planning in 2009 and culminating in the County's denial of the Project in June 2020, the Project underwent countless meetings with County staff, scoping and planning group meetings, project revisions and refinements, 10 public hearings, and three CEQA environmental review periods.

**C.    Project Description**

31. The Project proposed a broad range of homes for all income levels interspersed within a mixed-use pedestrian-oriented design achieved through the Lilac Hills Ranch General Plan Amendment and Specific Plan. The community proposed a mix of uses, including residential, commercial, retail, office, institutional, parks, trails, and supporting facilities, infrastructure, and other amenities.

32. Specifically, the Project proposed 1,746 homes (2.9 dwelling units per acre), a town center with a 50-room country inn and 90,000 square feet of

11

commercial, retail, and office uses, a 9.7-acre school site, a 200-bed group care facility, a senior community center, a community purposes facility (private recreational facility and fire station site), 25.6 gross acres of public and private parks, 16 miles of multi-use community trails and pathways, waste and water recycling facilities, and approximately 104 acres of permanent open space to retain sensitive biological/wetland habitat, cultural resources, and some existing agriculture. The Project constitutes a "Housing development project" within the meaning of Government Code Section 65589.5(h)(2).

### D.    Project Initiation (2009-2011)

33.    In November 2009, then-applicant Accretive Investments requested authorization to apply for a General Plan Amendment through County Board Policy I-63. At the time, the County was in the long-standing process of updating its General Plan. Due to the General Plan update process, Policy I-63 provided that any amendments to the General Plan must be authorized by the Planning Director, Planning Commission, or Board of Supervisors and that property owners could present private requests to initiate General Plan Amendments, and such requests were referred to as a "Plan Amendment Authorization" (PAA).[3] Accretive Investments submitted its PAA application to the Planning Director, in accordance with Policy I-63. In December 2009, the Planning Director informed Accretive Investments that he would not authorize the PAA due to the pending General Plan update process and declined to initiate the request.

34.    In March 2010, Accretive Investments appealed the Director's decision to the Planning Commission. The Commission conducted numerous hearings regarding the PAA, including a site visit. On December 17, 2010, after eight months,

---

[3] The County initiated its General Plan update process as early as 1998 and finally adopted its General Plan Update in August 2011. Therefore, incredibly, it took 13 years to update an existing planning document, so it is no wonder the County had a policy to authorize General Plan Amendments during its 13-year General Plan update process.

the Commission granted the PAA, which gave the green light for the Project to move forward.

35. In August 2011, the County's Board adopted its General Plan Update.

**E.    Project Application (2012-2015)**

36. In April 2012, Accretive Investments submitted its development application to the County, including its General Plan Amendment to the Land Use and Mobility Elements of the General Plan and associated community plan amendments. Accretive Investments' April 2012 application was the first major General Plan Amendment proposed for consideration since the County adopted its General Plan Update in August 2011.

37. In May 2012, the County publicly circulated the Notice of Preparation of the Draft EIR for the Project and held an EIR public scoping meeting in July 2012.

38. In July 2013, the County completed the Draft EIR for the Project, which was made available for public review and comment from July 3 to August 19, 2013. Based on the comments received, the County required substantial changes to the Draft EIR, and further required that it be recirculated for an additional 45-day public review and comment period from June 12 to July 28, 2014.

39. In 2015, the County required completion of the Lilac Hills Ranch Draft Final EIR (2015 Final EIR), which included the County's written responses to public and agency comments, clarifications to the EIR, and minor modifications to the Project. The 2015 Final EIR was also made available on the County's website to facilitate additional public review and agency consultation.

40. The Project and the 2015 Final EIR were presented to the County's Planning Commission at three public hearings held on August 7, August 12, and September 11, 2015. On September 11, 2015, at the recommendation of County staff, the Planning Commission voted to recommend EIR certification and Project approval to the Board with modifications and conditions.

COMPLAINT FOR INVERSE CONDEMNATION AND EQUAL PROTECTION AND SUBSTANTIAL DUE PROCESS VIOLATIONS; AND VERIFIED PETITION FOR WRIT OF MANDATE

41. In November 2015, the California Supreme Court issued its decision in *Center for Biological Diversity v. California Department of Fish and Wildlife* (2015) 62 Cal.4th 204 regarding the adequacy of the methodology employed in the analysis of GHG emissions under CEQA. The Court's ruling affected the GHG emissions analysis in the 2015 Final EIR for the Project and put a pause on further processing.

**F.  Voter Initiative (2016)**

42. In 2016, then-applicant Accretive Investments placed a modified version of the Project on the 2016 countywide ballot as a voter initiative. The initiative did not incorporate County staff's or the Planning Commission's modifications and conditions. As such, an inferior version of the Project was placed on the ballot and was not approved by the voters for two important reasons: (a) the initiative project did not incorporate County recommendations to modify and improve the Project; and (b) it did not complete the environmental review process, thereby deviating from the County's customary land-use permitting process.

**G.  Revised Project Application (2017-2018)**

43. In 2017, after the failed voter initiative, Village Communities' ownership decided to acquire and take over the long-studied Project. At that time, Village Communities considered two important factors before taking ownership of the Project. First, Village Communities focused on the significant time and funding that the County and the Project's prior applicant had invested in the Project's permitting and environmental review process to envision a community that County staff and the Planning Commission, in 2015, recommended be approved by the Board. Second, Village Communities noted the reasons for the failed voter initiative, but before making any decision to proceed, it met with staff, the Planning Director, and the County's Deputy Chief Administrative Officer to determine whether the Project, as modified, was still worthy of advancing to the County.

44. At that time, County senior staff informed Village Communities that the Project would need to be modified and go above-and-beyond County standards. The

14

message was *not* that the Project, if modified by incorporating all staff and Commission recommendations, would be "inconsistent" with the General Plan safety policies; and therefore, should be withdrawn. Additionally, inadequate fire safety or evacuation was never mentioned.

45. Based on the above factors, Village Communities decided to move forward with the Project — as modified in accordance with County senior staff directives. In June 2017, the new applicant, Village Communities, resumed the processing of the revised Project. Village Communities' first step was to explicitly add to the Project every modification, condition, and improvement requested by County staff and the Planning Commission, detailed in a separate Specific Plan (Appendix "J").

46. From approximately mid-2017 through February 2018, County staff reviewed the revised and updated Project documentation and required completion and recirculation of the 2018 Draft Revised EIR. The 2018 Draft Revised EIR included: (a) updated EIR sections, specifically traffic and GHG emissions; (b) updated GHG, air quality, traffic, and noise technical analyses; and (c) a "Recirculation Reader's Guide" explaining the County's decision for recirculation. At the same time, the County required the 2018 Specific Plan to be made available for review, along with Appendix J to the Specific Plan (an appendix summarizing the Project modifications).

47. The 2018 Draft Revised EIR was made available for another 45-day public review and comment period, starting February 22 and ending April 9, 2018.

48. One of the notable EIR comments was from CALFIRE (signed by Chief Tony Mecham) dated March 7, 2018, which did not mention the need to obtain off-site easements or additional evacuation routes.

**H.   The 2018 Modified Project**

49. In June 2018, the Planning Commission considered the changes made to the Project since the Commission's 2015 approval recommendation to the Board. After a public hearing held on June 8, 2018, the Planning Commission determined

15

that the Project changes were (i) not so substantial as to warrant any change to its 2015 approval recommendation, and (ii) all Project changes only improved the Project. Thus, the Commission voted to advance the modified Project to the Board as expeditiously as possible.

50.    At that time, the 2018 staff report confirmed Village Communities made "no change" to the General Plan Amendment that the Planning Commission had considered and recommended for Board approval in 2015. The 2018 staff report also attached its prior 2015 report, finding that the Project's "Specific Plan was reviewed to ensure that the proposed General Plan Amendment *is in the public interest and would not be detrimental to public health, safety, and welfare.*" 2015 Staff Report, p. 41, emphasis added. Further, County staff *"reviewed all of the 473 goals and policies* [of the General Plan] in order to determine those that were applicable to the project and *determined it to be consistent* except where text revisions have been proposed [in the Valley Center and Bonsall community plans]." *Id.,* emphasis added.

51.    Moreover, the 2018 and attached 2015 staff reports confirmed that the Project had "demonstrated that all necessary services and facilities would be provided to serve the project as required by the General Plan and Board of Supervisors' Policy I-84 (*Project Facility Availability and Commitment[s] for … Fire Services*)." 2015 Staff Report, p. 20, emphasis added. Further, County staff found that the Project applicant was "responsible for funding all the necessary services and facilities to serve the project" and that the "Project Facility Availability Forms all indicate that the project is located within a service district and services are reasonably expected to be available within the next five years." *Id.*

52.    As to fire service specifically, the 2018 and attached 2015 staff reports confirmed that: (a) the Project site was situated within the Deer Springs Fire Protection District (DSFPD); (b) the DSFPD provided the Project Facility Availability Form indicating that fire and emergency services would be *adequate* to serve the project; (c) a Fire Protection Plan for the Project was approved by the

16

DSFPD; (d) the approved Fire Protection Plan detailed the locations and widths of appropriate fuel management zones, road widths, secondary access, water supply, and hydrant spacing, all of which complied with DSFPD and County Consolidated Fire Code standards; and (e) the Project would be *conditioned* (post-approval) to meet the County's General Plan five-minute travel time. 2015 Staff Report, p. 21, emphasis added.

53.    As to fire hazards, staff determined that the DSFPD was "the fire authority having jurisdiction" over the Project and that portions of the Project site were "within a very high Fire Hazard Severity Zone (FHSZ) and the remainder … [was] within a moderate FHSZ." *Id.* at p. 71. County staff added that the Project's "Fire Protection Plan … *identified measures necessary to adequately mitigate potential wildfire impacts*" and based on the Project's fire modeling, *additional project design features [were] incorporated into the project*[.]" *Id.*, emphasis added.

54.    In addition, County staff evaluated the Project's Evacuation Plan, which identified evacuation routes, evacuation points, and specific measures to keep future residents and employees informed about what to do in the event of an emergency. *Id.* County staff found that the Evacuation Plan included "*both primary and secondary evacuation routes*" and that "*[a]ll proposed evacuation routes have been designed in accordance with the County Consolidated Fire Code* and would comply with minimum horizontal radius, fall within the 20 percent maximum allowable grade, and meet or exceed the minimum paved width requirements." *Id.* at pp. 71-72, emphasis added.

55.    County staff pointed out that the Evacuation Plan was "designed to allow adjustments to the plan throughout each phase of construction [expected to last 10 years] and fire and law enforcement officials [would] be given an opportunity to review the plan to ensure its accuracy with each future phase." *Id.* at p. 72. Staff noted that the Evacuation Plan "include[d] an educational component that ensure[d]

17

that evacuation information [was] consistently and timely communicated to residents." *Id.*

## I.   Delays After 2018 Planning Commission Recommendation to Expeditiously Proceed to the Board

56.   After the Planning Commission's vote to advance the Project to the Board, the Project was placed on the Board agenda for October 31, 2018. The Project was then rescheduled to December 12, 2018; however, as the hearing approached, Village Communities discovered that staff was not preparing the Project for the December 2018 hearing. This led to confusion and concern by Village Communities, which in turn caused the Planning Director to state that he would get to the Project "when [he] get[s] to it," adding that he could take on the Project personally, but it would "sit on [his] desk and collect dust" and that Village Communities would need to wait because his staff's current schedule included a "tremendous work load."

57.   In the meantime, Village Communities worked with staff to complete the Project's Final EIR, which comprised the 2013 Draft EIR, the 2014 Draft Revised EIR, the 2015 Final EIR, and the 2018 Draft Revised EIR.

58.   Notably, the prior EIR documentation evaluated the Project's fire hazard potential and the EIR identified either no impacts associated with potential hazards or required mitigation or design features to ensure that all potentially significant hazards were reduced to less-than-significant levels. And according to the 2015 Final EIR, the Project's Fire Protection Plan (discussed below) was "prepared in accordance with the DSFPD Ordinance No. 2020-01 ("District Standards") and the County guidelines and reference material in the 2011 Consolidated Fire Code, Guidelines for Determining Significance (See Appendix J to the EIR)." According to that EIR, the Fire Protection Plan also "evaluated the level of potential fire hazard affecting or resulting from the proposed project and the methods and measures required to minimize that hazard" and found that the *"wildfire threat will be mitigated to less*

*than significant* by the incorporation of [a myriad] of … Project design features." See, e.g., 2015 Draft Final EIR, Appendix W, emphasis added.

**J.    Project Fire Issues (Late 2019-Early 2020)**

59.    The Project's Fire Protection Plan was accepted by the DSFPD, which is the fire authority having jurisdiction over the Project site. Village Communities is informed and believes, and on that ground alleges, that the County Fire Authority also reviewed the Plan and provided comments on fire safety. The Plan, at page 47, states that:

> "If the recommendations in this Plan are implemented, this development *will not expose people or habitable structures to a significant risk of loss, injury or death.* Following the recommendations *would also decrease the risk of loss for surrounding existing uses.* As proposed, the project is *not* anticipated to contribute to a significant cumulative impact relative to wildland fire risk." Emphasis added.

The Project was deemed fire safe by County staff and the Planning Commission with input from the County Fire Authority in 2015, and these determinations were reaffirmed in 2018.

60.    Throughout Project processing, Village Communities nonetheless agreed to additional design features to ensure fire safety, going above and beyond any previously proposed General Plan Amendments, including:

(a)    Constructing a robust road network and add new road lanes before any Project home is occupied;

(b)    Funding $2 million to implement vegetation management along off-site designated evacuation routes, including West Lilac Road;

(c)    Funding vegetation management in perpetuity along designated off-site evacuation routes, including West Lilac Road, through the Project's Homeowner's Association;

(d)    Increasing defensible space, exceeding code requirements, around the Project and adding strategically located heat-deflecting walls;

19

(e)   Including hardening features for all new homes above and beyond all local and state regulations; and

(f)   Constructing three strategically-placed hardened structures to provide "Temporary Areas of Safe Refuge."

61.   In December 2019, Village Communities also submitted its Wildfire Safety Compendium (Fire Compendium; Volumes I and II) to the County, which as the name suggests compiled all the Project's fire safety design features for ease of review.   The Project's systematic approach to fire safety included, among other features:

(a)   providing five evacuation routes (three more than required by code);

(b)   funding vegetation management along West Lilac Road and hardening adjacent residences;

(c)   providing adequate firefighting water supplies by installing a water supply system over double that required by code;

(d)   requiring ignition-resistant construction requirements per the building code;

(e) providing fire and building code guidance for the protection of non-residential structures;

(f)   including provisions for fire apparatus and secondary emergency access roads;

(g)   constructing a new fire station and providing equipment and funding for firefighter staffing;

COMPLAINT FOR INVERSE CONDEMNATION AND EQUAL PROTECTION AND SUBSTANTIAL DUE PROCESS VIOLATIONS; AND VERIFIED PETITION FOR WRIT OF MANDATE